## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SHELLY MURRAY for C.M., | ) | |
| | ) | CASE NO.     1:10-cv-02850 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Shelly Murray ("Murray"), on behalf of her minor son, C.M., challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying the claim for Supplemental Security Income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, 20 C.F.R. § 416.924a.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  The case is before the Court pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

### I.  Procedural History

On September 17, 2007, Murray filed an application for SSI benefits on behalf of C.M., a school-age child, due to a variety of impairments.  C.M.'s application was denied both initially

and upon reconsideration.  Murray timely requested an administrative hearing.

On March 24, 2009, an Administrative Law Judge ("ALJ") held a hearing during which Murray and C.M., represented by counsel, were in attendance.  On April 29, 2009, the ALJ found that C.M. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled an impairment listed in Appendix 1.  She concluded, therefore, that C.M. was not under a disability.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

C.M., born in March of 1996, was thirteen years old at the time of his administrative hearing.  (Tr. 14.)

***School Records***

On October 23, 2007, Ms. Kanz, an intervention specialist at Madison South Elementary school, completed a teacher questionnaire.  (Tr. 140-47.)  C.M.'s special education services included extended test time, frequent breaks, small groups, and a quiet setting.  (Tr. 140.)  In the area of attending and completing tasks, she opined that C.M. needed constant one-on-one assistance to stay on task and finishing his work, but had only "a slight problem" carrying out single-step instructions, working without distracting himself or others, and working at a reasonable pace/finishing on time.  (Tr. 142.)  In the area of interacting and relating with others, she opined that C.M. had only slight problems making and keeping friends, and expressing anger appropriately, while she found no problems in all other categories.  (Tr. 143.)  Ms. Kanz wrote that C.M. was a good person, who was "always willing to share."  *Id*.  She also noted that C.M. did not have any behavioral goals in his "IEP."  *Id*.

2

On February 26, 2009, Ms. Kanz completed a School Activities Questionnaire.  (Tr. 243-44.)  She noted that C.M. had poor work habits and a "refusal to work."  (Tr. 243.)  She rated his ability to understand and complete assignments on time, as well as his ability to respond to criticism, as extremely below average.  *Id*.  In the two years she had known C.M., she noted he had not been disciplined or suspended, though he had a long-term history of severely inappropriate school behavior.  (Tr. 244.)  He argues with teachers and says inappropriate words. *Id*.

**Medical Evidence**

In June of 2005, C.M. began treatment with Jamila Khan, D.O., a psychiatrist (Tr. 395.)

On May 3, 2007, Murray took C.M. to the emergency room ("ER") because she had difficulty controlling him at home.  (Tr. 280.)  She said he was being "oppositional," was hiding from people, and being destructive.  *Id*.  His physical examination was normal, and C.M. was socially interactive and pleasant.  *Id*.  After speaking with Social Services, Murray took C.M. home, but agreed to follow up with a crisis intervention center later that day.  *Id*.

On September 18, 2007, Murray complained to Dr. Khan that the medication he prescribed was not working, and that C.M. does not want to do his homework.  (Tr. 256.)  On examination, C.M. exhibited good hygiene, goal-oriented thought content, and fair insight/judgment.  *Id*.

On September 25, 2007, Murray told Dr. Khan that, according to his teachers, C.M. was hyperactive.  (Tr. 254-55.)  On examination, C.M. exhibited good hygiene, goal-oriented thought content, bland affect, grossly intact cognition, and fair insight/judgment.  *Id*.  C.M. did not report any side effects from the medication.  *Id*.

3

On October 2, 2007, it was noted that C.M. still had difficulty paying attention in school and at home.  (Tr. 252-53.)  On examination, C.M. exhibited good hygiene, goal-oriented thought content, bland affect, calmer behavior, and fair insight/judgment.  *Id*.  Dr. Khan discontinued one of C.M.'s three medications noting that it did not work.  *Id*.

On November 7, 2007, State agency psychologist Irma Johnston, Psy.D., reviewed C.M.'s record and found that C.M. had an impairment or combination of impairments that are severe, but do not meet, equal, or functionally equal the Listings.  (Tr. 294-97.)  Dr. Johnston opined that C.M. had less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others.  (Tr. 296.)  In addition, C.M. had no limitation in moving about and manipulating objects or caring for oneself.  (Tr. 297.)  Dr. Johnston did not offer an opinion regarding C.M.'s health and physical well-being.  *Id*.

On January 8, 2008, Murray reported that C.M.'s behavior had gotten worse since he had been prescribed Lithium, but improved after he stopped taking it.  (Tr. 392-93.)  Later, Murray reported that C.M. was irritable and had pulled a knife on his brother.  (Tr. 394.)  She requested a mood stabilizer for C.M.  *Id*.  On February 19, 2008, Murray reported that C.M. was "still stealing" and thinks that people are talking about him.  (Tr. 386-87.)  On examination, C.M. exhibited good hygiene, goal-oriented thought content, was calm, had grossly intact cognition, and had fair insight/judgment.  *Id*.  He was continued on medication and advised to follow up in two weeks.  (Tr. 387.)

On March 11, 2008, Murray reported that C.M. was "moody and snappy," but there were no complaints from his school.  (Tr. 384-85.)  On examination, C.M. exhibited good hygiene, goal-oriented thought content, grossly intact cognition, and had fair insight or judgment.  *Id*.

4

On March 13, 2008, psychologist J. Joseph Konieczny, Ph.D., completed a consultative psychological evaluation at the request of the State agency.  (Tr. 331.)  He noted that C.M. had no significant medical history.  (Tr. 332.)  Murray told Dr. Konieczny that when C.M. was not on medication he was oppositional, defiant and very profane, but that the medication alleviated these symptoms.  *Id.*  Upon examination, Dr. Konieczny noted that C.M. had adequate grooming and hygiene, was very pleasant and cooperative, and answered all his question.  *Id.*  Dr. Konieczny concluded that C.M.'s ability to concentrate and to attend to task appeared to be adequate.  *Id.*  He showed no symptoms of hyperactivity, restlessness, or inattentiveness, nor indications of mood swing or mood disturbance.  *Id.*  In the four subtests of the WISC-IV, C.M. had composite scores of 87 in verbal comprehension, 90 in perceptual reasoning, 83 in working memory, and 62 in processing speed.[1]  (Tr. 333.)  C.M.'s full scale IQ was assessed as 76, falling within "borderline range of intellectual functioning."  *Id.*  In the five subtests of the Wide Range Achievement (WRAT) test, C.M. scored 96 in word reading, 87 in sentence completion, 86 in spelling, 71 in math computation, and 90 in reading composite – scores in the average to low average range.  (Tr. 333-34.)  Dr. Konieczny noted that C.M.'s results in word reading were in the average range and significantly higher than what would be anticipated, given his results on the WISC-IV.  (Tr. 334.)  Dr. Konieczny diagnosed C.M. with ADHD, predominantly hyperactive-impulsive type, in partial remission and a learning disorder, not otherwise specified. (Tr. 335.)  He offered no diagnosis regarding intellectual functioning.  *Id.*

Dr. Konieczny concluded that C.M.'s capabilities in the area of cognition, communication, social

---

[1]  The Wechsler Intelligence Scale for Children-IV test was administered by psychology assistant Adrian Bennett, M.A.  (Tr. 331.)

and emotional skills and personal and behavioral patterns were at three-quarters of age appropriate functioning and his motor skills were adequate for an individual his age.  *Id*.  He assessed C.M. with a Global Assessment of Functioning (GAF) score of 64, and a functional severity GAF score of 56.[2]  (Tr. 336).

On March 19, 2008, State agency psychologist Douglas Pawlarczyk, Ph.D., reviewed C.M.'s records.  (Tr. 340-45.)  Dr. Pawlarczyk agreed with Dr. Johnston that C.M. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and no limitation in moving about and manipulating objects, caring for himself, or in health and physical well-being.  (Tr. 342-43.)

On June 24, 2008, Dr. Khan completed a medical and functional equivalence questionnaire.  (Tr. 349-52.)  Dr. Khan noted that she was C.M.'s child psychiatrist and had treated him for three years.  (Tr. 349.)  She opined that C.M. had marked limitations in attending and completing tasks, interacting and relating with others, caring for oneself, health and physical well being, moderate limitations in acquiring and using information, and no limitation in moving about and manipulating objects.  (Tr. 349-351.)

On November 11, 2008, Murray told Dr. Khan that C.M. was stealing, had difficulty getting along with others at school, and was destructive at home.  (Tr. 368-69.)  On

---

[2]  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  A person who scores in this range may have a depressed mood, mild insomnia, or occasional truancy, but is generally functioning pretty well and has some meaningful interpersonal relationships.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *Id.*

6

examination, C.M. was noted to be mildly irritable, but no other abnormalities were identified. *Id.*

On December 23, 2008, Murray reported to Dr. Khan that C.M. was having difficulties tolerating the stimulants and had bilateral hip irritation related to a prescribed patch. (Tr. 366.) On examination, C.M. exhibited good hygiene, goal-oriented thought content, grossly intact cognition, and fair insight or judgment. *Id.*

On January 20, 2009, Murray reported to Dr. Khan that C.M. was having difficulty with attention and hyperactivity while his mood had been fair. (Tr. 364.) On examination, C.M. exhibited good hygiene, was amiable, had grossly intact cognition, and fair insight/judgment. *Id.*

On February 3, 2009, Murray reported to Dr. Khan that C.M. was less hyperactive at school, but "gets upset at everything" and still had some irritability. (Tr. 362-63.) On examination, C.M. exhibited good hygiene, goal-oriented thought content, grossly intact cognition, and fair insight/judgment. *Id.*

On March 17, 2009, Dr. Khan completed a second medical and functional equivalence questionnaire. (Tr. 395-98.) She opined that C.M. had marked limitations in attending and completing tasks and interacting and relating with others, moderate limitations in acquiring and using information and caring for oneself, and no limitation in moving about and manipulating objects or in his health and physical well-being. (Tr. 396-97.) She noted that C.M.'s family terminated counseling at the center in November of 2008. (Tr. 398.)

### *Hearing Testimony*

At the hearing, C.M. testified as follows:

- His grades are "not too good" and he has particular trouble understanding math and reading. (Tr. 29.) His favorite subject is art. (Tr. 30.)

7

- He likes to ride his bike and is involved in boy scouts.  (Tr. 30-31.)

- He gets along with others at both school and at scouting meetings.  (Tr. 31.)

- He does not have video games at home, and usually plays with toy cars when he is bored.  (Tr. 32.)

- As far as chores, he washes dishes and puts away his clothing.  *Id.*

- He and his friend receive separate instructions from their teacher.  (Tr. 33-34.)

- He has not been in trouble the current school year, but, in previous years, he was often disciplined for "either hitting kids or pushing them."  (Tr. 34.)

- He does not know why he sees Dr. Kahn for treatment.  (Tr. 35.)

At the hearing, Murray, C.M.'s mother, testified as follows:

- C.M., who is currently in sixth grade, has been in IEP since the third grade.  (Tr. 36.)

- There are six other children in C.M.'s class.  C.M. has a hard time concentrating, and the work he cannot finish in school gets sent home with him as homework.  (Tr. 36.)

- C.M. had repeated one grade, but does not receive tutoring.  (Tr. 38.)

- He had not been disciplined during the current school year, but had previously been in fights.  (Tr. 39.)

- C.M. sees Dr. Kahn to help him with behavioral issues.  (Tr. 43.)

- C.M. is assigned chores, such as washing dishes, putting his clothes away, and sweeping, but he does not always complete them.  (Tr. 43.)

- C.M.'s hygiene is fine except for needing to remind him to brush his teeth. (Tr. 43-44.)

- C.M. has bad days where he mouths off, refuses to do anything, and behaves destructively (*i.e.* punches walls and throws things).  (Tr. 44.) Teachers, however, have not complained to her that C.M. talks back at

8

school.  (Tr. 45.)

- Since C.M. started receiving treatment, medication, and special services in school, his behavior is more within the normal range.  No additional services were added since C.M.'s most recent IEP evaluation.  (Tr. 45-46.)

- At the time of the hearing, C.M. was still seeing Dr. Kahn but stopped seeing counselor Kelly McGuire.  (Tr. 46-47.)

### III.  Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under the Act.  "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At step two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).   At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment.  20 C.F.R. § 416.926a(a).  The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and

9

physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.

If an impairment is found to meet, or qualify as the medical or functional equivalent of a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings regarding C.M. in the April 29, 2009, decision:

1.    The claimant was born [in] 1996. Therefore, he was a school-age child on August 31, 2007, the date the application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

10

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 416.924(b) and 416.972).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD); oppositional defiant disorder (ODD); borderline intellectual functioning (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

*\*\*

5.    The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

*\*\*

6.    The claimant has not been disabled, as defined in the Social Security Act, since August 31,2007, the date the application was filed (20 CFR 416.924(a)).

(Tr. 14-20.)

**V.  Standard of Review**

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.*

11

*Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner, and hence the ALJ, are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI.  Analysis

Murray claims the ALJ erred because substantial evidence proves that C.M. suffers from severe Attention Deficit Hyperactivity Disorder and a learning disability that result in marked impairments in two domains.  (ECF No. 16 at 7-12.)  The substantial evidence standard,

12

however, "presupposes that there is a zone of choice within which the [ALJ] can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  *Williamson v. Apfel*, 1998 U.S. App. LEXIS 30010 at *13 (6th Cir. 1998) *quoting Mullen*, 800 F.2d at 545.  Simply advancing a different interpretation of the evidence of record does not render the ALJ's decision unreasonable or untenable.

Murray also argues that the ALJ failed to accord proper weight to the opinion of C.M.'s treating psychiatrist, Dr. Khan.  (ECF No. 16 at 10-11.)  Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 192 F. App'x 456, 460 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)).  Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.  *Id*. at 460-61.  It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim.  *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Whitson v. Finch*, 437 F.2d 728, 732 (6th Cir. 1971).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination, the nature and extent of the treatment

13

relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision. *Id.*

The ALJ, however, is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.*

The ALJ addressed Dr. Khan's opinion as follows:

> Dr. Khan on June 24, 2008, assessed the claimant's domain limitations (Exhibit llF). In his assessment, Dr. Khan gave the claimant marked limitations in his ability to Attend and Complete Tasks, and in Interacting with Relating with Others. These marked limitations are not supported by any treatment notes. Additionally, moderate limitations in Acquiring and Using Information; Caring for Yourself are not supported by any treatment notes. Moreover, the claimant's parents have terminated counseling with Dr. Kahn's approval. Dr. Kahn and the claimant's parents were also aware that the claimant was no longer determined to be in need of an Individual Education Plan. It is unlikely Dr. Kahn would permit discharge of psychological treatment and supportive school services if he did in fact have the marked limitations he includes in his report. While Dr. Kahn would be entitled to controlling weight [as] a treating physician, this residual functional

14

capacity is given little weight because it is inconsistent with the medical evidence of record and Dr. Kahn's own treatment notes.  Additionally, the fact that the school multi-disciplinary team made a determination that the claimant was no longer in need of any additional support after their yearly evaluation is significant because the team includes, at the least, the claimant's parents, teachers, assistants, the school psychologist and special education specialist.  The combined opinion of the multi-disciplinary team also undermines the opinions of Dr. Kahn.  The undersigned specifically concludes that the reports of Dr. Kahn are from "treating sources" within the meaning of Sections 404.l502 and 404.l527 of Regulations No.4 and 416.902 and 4l6.927(d) of Regulations No. 16.  However, for the reasons cited herein[,]  his diagnostic and functional conclusions are not given "controlling" evidentiary weight, since they are not "well-supported" and "not inconsistent" with the other substantial evidence in her case. SSR 96-2p; 20 CFR 404.l527(d)(2); *Bentley v. Shalala*; 52 F3d 784, 786 (8th Cir. 1995); *Guilliams v. Barnhart*; 293 F3d 798, 803 (8th Cir. 2005).

(Tr. 15-16.)

The ALJ's above analysis sufficiently sets forth the reasons the ALJ declined to give controlling or great weight to Dr. Khan's opinion.  Murray merely points to school records and testing that indicates C.M. had problems paying attention or interacting with his peers.  (ECF No. 16 at 9-10.)  Murray, however, cannot establish that the ALJ failed to proffer legally sufficient reasons for rejecting Dr. Khan's opinion simply by pointing to such evidence. Notably, the ALJ did not find that C.M. lacked limitations in the ability to attend to and complete tasks, but rather that C.M. had less than marked limitations in the area.  (Tr. 18.)  The ALJ concluded that the *extent* of the limitations Dr. Khan ascribed to C.M. was not supported by Dr. Khan's own treatment notes.  While the evidence of record undoubtedly indicates that C.M. had difficulty in this social domain, a finding of less than marked limitation is supported by substantial evidence.  Dr. Khan's treatment notes are not extremely detailed, do not describe the marked limitations found in her opinion, and, for the most part, merely recite Murray's descriptions of C.M.'s problems at school and home.  Murray essentially argues that because the

15

evidence is capable of supporting Dr. Khan's opinion, this Court should find that the ALJ did not give good reasons for rejecting it.  The Court declines to do so, as the substantial evidence standard is a deferential standard of review and a *de novo* review would be inappropriate.[3]

## VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: January 10, 2012

---

[3] Finally, while it is uncontested that Dr. Khan is a treating source, it is debatable whether Dr. Khan's opinion – that C.M. has marked limitations in at least two domains and thereby functionally equals the Listings – constitutes a "medical opinion."  The Commissioner must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).  Opinions by treating sources on issues ultimately reserved to the Commissioner do not constitute "medical opinions" because they are case dispositive, and, therefore, they are not given "any special significance."  20 C.F.R. 416.927(e).  "Functional equivalence," means that a claimant's "impairments(s) must be of listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain ..."  20 C.F.R. § 416.926a(a).  Pursuant to 56 FR 36932 "[the SSA] did intend to restate in the regulations [its] policy that determinations of meeting the Listings and equivalency are reserved to the Secretary."  *See also* HALLEX Sec. II-4-105 ("In the preamble to [56 FR 36932], we provided lengthy discussions and responses to comments about the role of medical source opinions regarding equivalence, residual functional capacity, and other issues that are reserved to the Secretary because they are dispositive of the ultimate determination of disability.")  Neither party addressed the issue of whether Dr. Khan's opinion was tantamount to an opinion on equivalence – an issue reserved to the Commissioner.